## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **JAMES W. SMITH, Jr., on his own behalf and on behalf of those similarly situated,** | **Case No.** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **QUESTAR CAPITAL CORPORATION, YORKTOWN FINANCIAL COMPANIES, INC. and ALLIANZ LIFE INSURANCE COMPANIES of NORTH AMERICA,** | |
| **Defendants.** | |

_____

### INTRODUCTION

NOW COMES putative class Plaintiff James W. Smith, Jr. ("Smith") by and through his counsel, Scarlett & Gucciardo, P.A., Gordon & Doner, P.A., and Gustafson Gluek PLLC to bring this putative class action lawsuit under the Minnesota Securities Act and Minnesota common law.

1.     This class action arises in the wake of a debacle wrought by Defendant Questar Capital Corporation ("Defendant" or "Questar") when Defendant performed inadequate due diligence or ignored warnings from due diligence advisors about the grave dangers posed by selling securities issued by Diversified Business Services & Investments, Inc. ("DBSI"), a now-defunct Ponzi scheme that was based in Idaho.

2.     Relying on inadequate due diligence or rejecting due diligence warnings, Defendant sold several million dollars in DBSI-issued securities to what Plaintiff believes to have been hundreds of investors.

3.    Today, DBSI lies in bankruptcy, and the bankruptcy trustee in Delaware has sued Questar for over $2 million in commissions that DBSI paid to Questar.

4.    Plaintiff brings this putative class action, on his own behalf and for all others similarly situated, by their undersigned counsel, and makes the following allegations based upon the following: (i) his personal knowledge; (ii) information and belief; (iii) the investigation of their counsel, which included review of publicly available documents, (iv) reports filed by the court-appointed bankruptcy examiner for DBSI; and (v) offering documents issued by DBSI and its various subsidiaries.

5.    This is primarily an omissions case, and a case about the Questar's due diligence failures.  In short, Questar misled its customers like Smith, using its brokerage force as a conduit to mislead investors in order to continue selling DBSI securities for the sake of generating lucrative commissions and fees.

## BACKGROUND

6.    This putative class action arose when Defendant Questar offered and sold several million dollars' worth DBSI securities to unsuspecting investors.

7.    Upon information and belief, Defendant Questar distributed, offered, and sold DBSI securities, even though due diligence advisors repeatedly warned Questar that DBSI prospectuses and offering materials were misleading and that additional information was required to be disclosed so as not to mislead Questar customers. Questar did not care; instead, in favor of lucrative commissions and fees, Questar ignored the truth, or failed to exercise adequate due diligence to find the truth, which was

2

26635

that DBSI's accounting records and practices strongly indicated the existence of a Ponzi scheme.   In so doing, Questar violated the Minnesota Securities Act and Minnesota common law.

8.     Non-party DBSI is an Idaho corporation, with its principal place of business in Idaho.   Through various wholly owned operating subsidiaries and Special Purpose Corporations ("SPCs"), DBSI purported to finance the purchase of various real estate ventures.   DBSI used the SPCs to raise money from investors like Smith and putative class members.

9.     DBSI used the operating subsidiaries to monitor, administer, and service the receivables financings.   DBSI was not registered with the S.E.C. in any capacity.

## NATURE OF ACTION

10.     This is a putative class action, filed on behalf of all persons and entities who, from about October 16, 2006 until October 16, 2012 ("Class Period"), purchased or acquired securities issued by DBSI or DBSI's various subsidiaries via private placement offerings (the "DBSI Offerings") that, upon information and belief, were offered and sold through promotions, solicitations, or offers made by Defendant Questar. This action is brought under the Minnesota Securities Act and Minnesota common law.

11.     On or about February 19, 2008, DBSI subsidiary, DBSI 2008 Notes Corporation issued a Confidential Private Placement Memorandum ("PPM") for $90,000,000 in Corporate Notes that bore 9.5% interest.   *See* Exhibit A (S.E.C. Form D).

12.     Questar offered and sold notes issued by DBSI 2008 Notes Corporation,

as well as other securities offerings by DBSI and DBSI subsidiaries and affiliates as far

back as January 2005, according to a preference action filed in Federal Bankruptcy

Court in the District of Delaware,

13.     Beginning in or around January 17, 2005, a network of broker-dealers that

included Defendant Questar publicly solicited, offered, and sold securities, *i.e.*, notes

and other securities exempt from federal and state registration, for issuer DBSI and

DBSI's various subsidiaries and affiliates.

## JURISDICTION AND VENUE

14.     Federal subject matter jurisdiction is proper under the Class Action

Fairness Act of 2005.

15.     Plaintiff Smith resides in the State of Florida. Defendant Questar is a

Minnesota Corporation, with its principal place of business in Minneapolis, Minnesota;

Defendant Yorktown Financial Companies, Inc., is an Indiana Corporation.  Defendant

Allianz Life Insurance Companies of North America is a Minnesota Corporation, with

its principal place of business in Minnesota.   Consequently, federal subject-matter

jurisdiction stands proper under 28 U.S.C. § 1332.

16.     Venue is proper in this federal district because, and as set forth in more

detail below, the violations of Minnesota law that give rise to this putative class action

occurred in this District.

## PARTIES

17.     Plaintiff and putative class representative James Smith lives and resides in

26635

Miami, Florida.  At all times material to this complaint, Smith was a customer of Defendant Questar, and Defendant Questar sold Smith one note issued DBSI 2008 Notes Corporation for $50,000.

18.    Defendant Questar is a Minnesota Corporation, which maintains its principal offices and headquarters in Minneapolis, Minnesota.  Defendant Yorktown Financial Companies, Inc., is an Indiana Corporation with its principal place of business in Minnesota.  Defendant Allianz Life Insurance Companies of North America is a Minnesota Corporation, with its principal place of business in Minnesota.

## FACTS

19.    Since 2001, DBSI raised approximately $500 million from thousands of investors, by selling those investors securities issued by DBSI and its SPCs, including DBSI 2008 Notes Corporation, which was a $90,000,000 offering.

20.    In November 2008, DBSI and dozens of DBSI subsidiaries and affiliates, including DBSI 2008 Notes Corporation, filed for bankruptcy protection in the District of Delaware.

21.    Ultimately, the bankruptcy trustee sued Questar to clawback approximately $2.2 million in commissions and other fees that DBSI and its subsidiaries and affiliates paid to Questar for the sale of DBSI securities, including the DBSI 2008 Notes that Smith purchased.  The amount of the Trustee's claim indicates that Questar sold approximately $20,000,000 in DBSI securities, including DBSI 2008 Notes.

22.    The Bankruptcy Court appointed an Examiner.  The Examiner filed both

26635

an Interim Report and a Final Report that detailed the accounting chicanery, misdeeds, and misstatements that DBSI and its subsidiaries and affiliates made in the offer and sale of DBSI securities, including the DBSI 2008 Notes. See Exhibit B.

23.   The Examiner's Interim Report focused on DBSI's misuse of proceeds from the DBSI 2008 Notes Corporation offering, and is incorporated herein by reference.  The Interim Report drew the following conclusions after an extensive fact investigation:

   a. The 2008 Notes PPM assured investors like Smith that the offering proceeds would be used "to acquire, rehabilitate, entitle, develop and/or finance real estate assets prior to their sale, resale, third-party financing or syndication and to finance or re-finance non-real estate entities";

   b. Contrary to what the PPM stated, much of the 2008 Notes Proceeds were neither used to acquire real estate nor to finance or refinance loans.  Instead, the proceeds were used to the proceeds were used to prop up DBSI, a failing enterprise, by making 2008 Notes Proceeds available to fund then-current operations and obligation, including payments to investors in prior DBSI securities offerings;

   c. The 2008 Notes PPM also misstated that "proceeds from the sale of the Notes will be held in a separate account, which will be used only to pay offering costs and to fund loans, and will not be commingled with the Guarantor's financial or business accounts or with the accounts of any affiliates";

   d. But ten transfers of 2008 Notes Proceeds occurred, wherein the 2008 Notes Proceeds were in fact commingled to an extent that, to date, the Examiner has not be able to unravel;  *See* Examiner's Interim Report pp. 81-102 (Exhibit B).

   e. The 2008 Notes PPM included a financial statement, dated June 30, 2007.  That statement was material and significant to investors because, the Notes' issuer, agreed to unconditionally guarantee the

6

26635

Notes;

f.   The financial statement was misleading because it indicated that the Notes' issuer possessed $99 million in retained earnings which, if accurate, made the guarantee appear to be meaningful and substantial;

g.   However, the statement was neither audited nor GAAP-compliant; nor did the statement disclose with DBSI owned or DBSI-controlled entities were consolidated for reporting purposes;

h.   The financial statement was materially misleading also because the balance sheet netted payables and receivables from DBSI affiliates in a single entry; this "netting" payables and receivables concealed the size of loans receivable;

i.   The financial statement treated all receivables as collectible when, in fact, most receivables were not collectible, or at least doubtful and impaired;

j.   Nor did the financial statement disclose $140 million in loans to a DBSI-controlled entity, DBSI Redemption Reserve ("DRR"), which had no assets of its own.  Rather, DRR was nothing more than a conduit, through which money was commingled and transferred from one DBSI entity to another.

24.   The Examiner's Final Report makes clear that, as far back as 2005, DBSI stood in constant need of new investor funds in order to meet pre-existing obligations. In short, DBSI had become a Ponzi scheme, an easily discernible and discoverable fact that Questar's inadequate due diligence failed to detect, and one that Questar failed to disclose to investors like Smith.

25.   The Examiner's Final Report also laid out the following conclusions about DBSI:

26635

a. DBSI's guarantees were "illusory and were based upon the cultivated false appearance that DBSI had substantial value" when, in fact, DBSI stood insolvent—the guarantees were false and meaningless;

b. DBSI's marketing claim that "no investors had ever lost money" was likewise illusory and failed to disclose that only with newly-raised money from investors in subsequent offerings was DBSI able to meet prior obligations;

c. DBSI's general accounting ledgers were unreliable, unorganized, inconsistent, and often unintelligible—a fact that even a modicum of due diligence by Questar would have revealed;

d. DBSI insiders frequently took large distributions for themselves;

e. DBSI created false and misleading financial statements by using, among other devices:

   i. Inflated values for entities and assets;

   ii. Failing to fully and adequately disclose the nature of intercompany accounts receivables in DBSI and its subsidiaries and affiliates' financial statements;

   iii. Failing to make inter-company interest payments on loans and concealing this failure by converting accrued interest into principal;

   iv. Concealing mounting loan receivable amounts by converting loans into equity;

   v. Engaging in year-end cash manipulations, which made it appear that DBSI entities were well capitalized when, in fact, they were not;

   vi. DBSI accounting personnel often modified entries explaining transactions well after the transactions happened—another fact Questar could have easily discovered with even a modicum of due diligence;

26635

vii.   As early as 2004, DBSI accounting personnel indicate that DBSI faced severe cash shortages; and by 2006, the shortages had become "severe" such that DBSI formally monitored cash needs and position;

viii.   DBSI loaned money to various DBSI entities, reporting that the loans were backed-up by these entities collateral, but the value of the collateral was not set by independent appraisers; rather, the value was set by DBSI personnel, who possessed no training on valuation of collateral—a fact that Questar could have easily discovered with even a modicum of due diligence;

ix.   By 2007, DBSI property portfolio was losing $3 million a month, and shortly before DBSI filed Chapter 11, DBSI's property portfolio was losing $8 million a month—a fact that Questar could have easily discovered with even a modicum of due diligence;

26.   Upon information and belief, Questar's due diligence advisors raised questions about the accuracy of DBSI's offering materials and financial statements. Alternatively, upon information and belief, Questar's due diligence advisors' reports raised certain red flags that should have (but did not) prompt Questar to undertake its own independent due diligence.

27.   Armed with these due diligence reports and knowing about these red flags, Questar should have come to appreciate that DBSI likely was a Ponzi scheme. But, recklessly or negligently, Questar did not do so.

28.   Questar recklessly or negligently failed to disclose to either its brokers, its customers like Smith, and the putative class members that Questar was selling securities

26635

that it knew or, absent deliberate recklessness or negligence, should have known were part and parcel of a Ponzi scheme.

29.     Upon information and believe, Plaintiff alleges that several broker-dealers, who are not parties to this action, conducted proper due diligence and refused to offer or sell DBSI notes.  These broker-dealers performed adequate due diligence and protected their customers.  Favoring lucrative commissions over its customers' welfare, Questar did not do likewise.

30.     Instead, Questar failed to address any of the recommendations or red flags raised by due diligence analysts and instead withheld the actual reports from its own brokers and customers, against all advice from due diligence advisors.

31.     Upon information and belief, in each of the due diligence reports, due diligence advisors raised several material risks, but Questar failed to take reasonable steps to address or independently investigate these material risks with DBSI, or to disclose to investors these risks.

32.     Questar omitted to disclose to its brokers and customers that due diligence advisors had identified and warned about a number of material risks.

33.     Questar approved selling DBSI securities notes to investors without disclosing to its brokers or investors the risks identified by third-party due diligence advisors.  Further, Questar did so without demanding that DBSI amend or alter its PPMs to include risk disclosures urged by due diligence advisors.  Instead, Questar circulated those misleading PPMs to Questar customers like Smith, the putative class

10

26635

representative here.

34.    Specifically, DBSI stated values for its receivables and assets that were never verified by any sort of independent audit.

35.    Flouting the standard of care established by Questar's regulator, the Financial Industry Regulatory Authority ("FINRA"), Questar accepted DBSI's unverified valuations of receivables and assets, as well as DBSI's understated liabilities.

36.    Despite Questar's power to demand that DBSI submit to an independent audit, Questar never did so.   Instead, Questar disregarded its standard of care and continued selling DBSI securities.

37.    Nor did Questar conduct an adequate independent investigation into the warnings and risks cited in these third-party due diligence reports, prepared by, among others, the law firm of Mick & Associates, P.C., or Buttonwood Investment Services, LLC.

38.    Instead, Questar circulated DBSI's PPMs and offering materials that omitted these risks and warnings.

39.    Questar likely possessed the power to demand that DBSI include these risks and warnings in DBSI's PPM, or to simply stop distributing and selling DBSI notes; but, Questar did neither.

40.    Further, Questar absolutely possessed the power either to not sell DBSI securities and/or to not circulate DBSI PPMs that made such material omissions.  Yet, for the sake of lucrative commissions, Questar circulated DBSI PPMs to investors, even

26635

though Questar had reason to believe that those PPMs contained material omissions regarding the matters set forth herein, Questar circulated DBSI PPMs, including DBSI 2008 Notes Corporation.  Nor should Questar have even offered or sold DBSI securities at all, given Questar's lack of due diligence.

41.     The warning signs were present at DBSI and the various DBSI entities almost from the beginning; and, they were identified by due diligence advisors who, upon information and belief, repeatedly warned Questar that much more was required in the way of disclosures to clients.  Questar did nothing except promote DBSI as a safe investment for its customers.

42.     Instead, Questar circulated DBSI PPMs to Questar customers knowing (or negligently, not knowing) that those PPMs failed to adequately warn of the serious and increasing risks in DBSI securities, including the DBSI 2008 Notes.

43.     Now, investors like Smith and the putative class members here, face the prospect of losing their entire investment.

44.     DBSI's, and the SPC's financial statements did not comply with Generally Accepted Accounting Principles ("GAAP"). Indeed, the financial statements, to the extent they even existed, contained gross violations of GAAP, violations that bespoke fraud by DBSI and that betrayed Questar's recklessness or negligence in detecting (or failing to detect), but not disclosing, any of the numerous red flags of fraud that were flying high over DBSI and the various DBSI entities, including, but, not limited to DBSI 2008 Notes Corporation.

12

26635

45.     Questar ignored, and failed to disclose to investors, these red flags because Questar was earning huge commissions for its distributing, offering, and selling DBSI notes.  Nor did DBSI maintain its accounting records in a way that would allow GAAP-compliant financial statements to be generated—another ominous warning sign that Questar either detected and omitted to disclose, or did not detect because Questar turned a blind eye to every warning Questar's due diligence team offered.

46.     According to the Examiner's reports, DBSI's accounting hijinx included the following, all of which Questar failed to detect and disclose because Questar ignored its obligations under FINRA Notices to Members 03-71 and 10-22:

a.      Generally, DBSI's financial records and accountings are unreliable because the records did not comply with GAAP and because of fraudulent practices as inflated and overstated values on collateral, receivables, Questar would have discovered this unreliability as quickly as the Examiner did;

b.      DBSI's grossly over-valuing its investments in various technology companies;

c.      DBSI's grossly over-valuing its assets and collateral;

d.      DBSI's use of DRR as an intermediary to accumulate cash from various offerings and then transfer that cash as needed to other DBSI entities— DRR purportedly existed as a partnership, but according to the Examiner, no partnership agreement exists for this entity—another fact and a red flag that Questar could have easily discovered with even a modicum of due diligence;

47.     Questar circulated DBSI PPMs and marketing materials to Smith and to members of the putative class. Those documents omitted disclosure of the facts and risks identified in paragraphs 23, 25, and 46, *supra.*, and were therefore materially false and

13

26635

misleading.   These omissions rendered statements like the one in DBSI 2008 Notes Corporation materially false and misleading.

48.     Questar knew, or was deliberately reckless or negligent in not knowing, that the DBSI was guaranteeing the 2008 Notes and that no DBSI investor had ever lost money.

49.     These statements were materially false and misleading when made because, only by all of the accounting chicanery identified in paragraphs 23, 25, and 46, *supra.*,  was DBSI able to provide the putative class this materially misleading and false statement about DBSI's guarantees and DBSI assurance that no investor had ever lost money.

50.     Questar knew, or was reckless or negligent in not knowing that these statements were materially false and misleading because Questar either ignored due diligence warnings or failed to conduct adequate due diligence before recklessly (or negligently) circulating to members of the putative class, including Smith, DBSI PPMs. Further, Smith was solicited by Questar to invest in the DBSI note, and he was assured that DBSI was a safe and well established company that would provide reliable returns. Smith reasonably relied on what he was told, especially the representation of limited financial risk, in purchasing the DBSI note in question.   Upon information and belief, similar misrepresentations were made the putative class members.

51.     Nowhere did DBSI 2008 Notes Corporation PPM disclose that DBSI's collateral might be overvalued.  Nor did any DBSI PPM indicate that investor proceeds

14

26635

were not segregated.  Nor did any DBSI PPM indicate that investor proceeds would be used to prop up DBSI by paying off old debts and paying daily operating expenses.

52.     Further, Questar knew, or was reckless or negligent in not knowing, the false and misleading nature of that statement in the DBSI PPMs that Questar disseminated to the putative class.  Had Questar satisfied its due diligence obligations, it likely would have discovered DBSI's outdated and worthless purported receivables.  But Questar did not do so.

53.     In the face of due diligence warnings (or in the absence of adequate due diligence by Questar), Questar was reckless (or negligent) in circulating to the members of the putative class, including Smith, DBSI 2008 Notes Corporation PPM, which contained the false and misleading financial statements, balance sheets, statements about use of proceeds, guarantees by DBSI, the true amount of inter-company debt the impaired nature of that debt, and overvalued various investments.

54.     Questar either recklessly or negligently ignored the false and misleading nature of these statements, or Questar failed to discover the same because of a reckless or negligent lack of due diligence.

55.     In either event, Questar recklessly or negligently circulated the DBSI 2008 Notes Corporation PPM that contained these misstatements and recklessly omitted to disclose that DBSI's primarily strategy was to appear profitable by continuing to raise new funds from new investors.

26635

56.     Put differently, DBSI's reason for doing so was to perpetuate the Ponzi scheme—something Questar should have (and could have easily) discovered.   But Questar did not.

57.     Questar either recklessly or negligently ignored the false and misleading nature of this statement or failed to discover the same because of a reckless or negligent lack (or inadequate) of due diligence.

58.     In either case, Questar recklessly circulated the DBSI offering materials that contained this misstatement and recklessly or negligently omitted to disclose that DBSI's primarily strategy was to purchase receivables from prior DBSI entities.

59.     Questar's due diligence analysts learned about some or all of the above red flags, but Questar recklessly or negligently failed to warn its brokers or investors about the accounting chicanery and utter lack of internal controls at DBSI; thus, investors could know about the true degree of risk arising from the DBSI securities, including the DBSI 2008 Notes.

60.     Consequently, Smith and the putative class members face severe financial losses because Questar turned a blind eye toward (and failed to warn its brokers or its customers about) the panoply of red flags and warning signs apparent from the due diligence that Questar possessed, or that should have (and would have) been apparent had Questar conducted adequate due diligence.

61.     Finally, Questar circulated to investors material omissions made in DBSI's PPMs.  Those materially misleading omissions and misstatements detailed in

16

26635

paragraphs 23, 25, and 46, *supra*.

62.     Yet, for the sake of lucrative commissions, Questar rejected or ignored warnings provided  by Questar's own due diligence advisors—warnings that strongly pointed to DBSI's fraud, fraud that was easily identified when the Examiner undertook a review, wherein much of the information above can now be found.

63.     Notwithstanding the investors' right to be fully and fairly informed of material risks regarding DBSI's financial stability and non-GAAP compliant accounting Questar recklessly (or negligently) recommended, promoted, offered, distributed, and sold DBSI 2008 Notes and other DBSI securities to Smith and the purported class. Questar sold Plaintiff the following:

| Investment | Amount | Purchaser | Date |
|---|---|---|---|
| DBSI 2008 Notes Corporation | $50,000.00 | Smith | 2/21/2008 |

64.     At present, Plaintiff and the putative class members have sustained substantial losses in the DBSI 2008 Notes and other DBSI securities, which obviously are now worthless.

## CLASS ALLEGATIONS

65.     Plaintiff brings this putative class action under Federal Rule of Civil Procedure 23(b)(3).

66.     This is a putative class action, filed on behalf of all persons and entities,

17

except those identified in paragraph 68, to whom Defendant Questar publicly offered, distributed, and sold DBSI 2008 Notes and other securities ("Class") from October 16, 2006 until October 16, 2012 ("Class Period").

67.    The putative class satisfies Rule 23 (a) regarding numerosity, typicality, commonality, and adequacy.

68.    Excluded from the putative class are the Defendants, Defendants' directors and officers, immediate families of Defendants' directors and officers, and any entity in which the Defendant maintained a controlling interest, or that is related to or affiliated with the Defendant, or the legal representatives, agents, affiliates, heirs, successors-in-interests or assignees of any such excluded person.

69.    The members of the putative class are so numerous that joinder of all members would be impracticable; Plaintiff estimates the number of putative class members to be several hundred or more.

70.    The precise number of putative class members can easily be ascertained from Questar's records, but likely exceeds several hundred.

71.    Notice may be provided to class members using first-class mail, published notice, and, where possible, electronic mail.

72.    Plaintiff will fairly and adequately represent the putative class. Plaintiff has retained counsel experienced in sophisticated securities class action litigation.

73.    Plaintiff's claims are typical of all putative class members' claims because Plaintiff's and all putative class members' damages stem from:  (i) the same material

26635

and misstatements omissions in PPMs issued by DBSI 2008 Notes Corporation and other DBSI securities offerings, and circulated to Smith and the putative class members by Questar; and (ii) the same recklessness or negligence, *i.e.*, Questar's abject failure to disclose what Questar's due diligence advisors revealed to Questar, which was that DBSI was essentially an insolvent Ponzi scheme with unreliable accounting records.

74.    All of these factors caused Smith and putative class members to suffer great financial harm. Defendant stood in the best position to prevent Plaintiff and the putative class members from purchasing DBSI securities.  Defendant failed to satisfy its obligation to perform its due diligence.

75.    A class action is superior to other available methods for the fair and efficient means to resolve this controversy.

76.    The prohibitive expense and burden on individuals to seek individual relief make it quite difficult for individual class members to seek redress against Questar for the misconduct and negligence identified in this putative class action Complaint.

77.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

78.    Common questions of law and fact exist as to all putative class members and predominate over questions affecting individual putative class members.  Among the questions of law and fact common to the putative class are:

a.    Whether Questar agreed with DBSI to distribute DBSI securities;

26635

b.      Whether Questar violated Minnesota's securities laws by failing to state material facts necessary in order to make the statements made in DBSI's PPMs, in the light of circumstances under which they were made, not misleading, when Questar circulated DBSI PPMs to Plaintiff and the putative class;

c.      Whether Questar violated Minnesota's securities laws by making omissions of material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, when Questar circulated DBSI promotional materials to its brokers, knowing its brokers would disseminate those materials to investors, but at the same time, withheld from its brokers and customers warnings of due diligence advisors;

d.      Whether Questar knew, or in the exercise of reasonable care could (and should) have known, of the untrue statements and misleading omissions in PPMs issued by DBSI and circulated by Questar;

e.      Whether Questar was negligent or reckless in its rejecting advice from Questar's due diligence advisors regarding DBSI's securities offerings, including DBSI 2008 Notes Corporation, and whether this negligence or recklessness damaged the putative class;

f.      Whether Questar was negligent in failing to adhere to the mandates, guidance, or standard of care provided by FINRA in Notice to Members 03-71 and 10-22;

g.      Whether Questar stands liable of negligent misrepresentation for the reckless misstatements and omissions they conveyed to Smith and to the putative class;

h.      Whether Defendants Yorktown and Allianz acted as control persons and whether either did not know, and in the exercise of reasonable care could not have known about Questar's conduct;

i.      Whether, and to what extent Smith and the putative class were damaged by Questar's conduct.

**COUNT ONE—VIOLATION OF THE MINNESOTA SECURITIES ACT, MINN STAT. §80A.68(1)**

79.     Plaintiff incorporates here by reference the allegations made in paragraphs 1 through 78, as if fully here alleged.

80.     Questar publicly distributed, offered, and sold promissory securities issued by DBSI via materially misleading PPMs and marketing materials. Questar publicly distributed, offered, and sold securities issued by DBSI via misleading omissions contained in the PPMs and marketing materials that Questar disseminated to its brokers and investors.

81.     The omissions were all substantially similar in DBSI PPMs, and are identified herein.

82.     In so doing, Questar acted with scienter or negligence—states of mind which can be averred generally.

83.     Additionally, Questar recommended that Plaintiff and the putative class members purchase DBSI securities, including, but not limited to DBSI 2008 Notes, by assuring Smith and the putative class that DBSI securities were a sound investment when, in fact, Questar lacked a reasonable factual basis to make such assurances given the lack of adequate due diligence.   Questar's doing so was deliberately reckless or negligent.

84.     Smith and the putative class members justifiably relied on the PPMs, marketing materials, and assurances circulated and made by Questar and upon other omissions made by Questar.  Reliance may be presumed here, given the existence of a

26635

common scheme perpetrated upon all class members.

85.    Questar's materially misleading omissions caused Smith and the putative class members to purchase securities issued by DBSI.

86.    When the truth about DBSI came out in August 2009 in the Examiner's Interim Report, Smith's and putative class members' investments in DBSI securities became worthless.

## COUNT TWO—VIOLATION MINNESOTA SECURITIES ACT, MINN STAT. §80A.68(2)

87.    Plaintiff incorporates here by reference the allegations made in paragraphs 1 through 78, as if fully here alleged.

88.    Questar violated the Minnesota Securities Act when Questar circulated to its brokers DBSI promotional materials and PPMs, all the while withholding material risks repeatedly highlighted by due diligence advisors and red flags that should have been apparent to Questar, knowing that its brokers would disseminate these materials to investors.

89.    In so doing, Questar used advertising and sales presentations in a deceptive and misleading manner because the information sent to investors omitted material risk information.

90.    These practices and this course of business by Questar operated as a fraud or deceit upon Smith and the putative class.  At all times, Questar acted with scienter, deliberate recklessness, or negligence.

22

26635

## COUNT THREE—AIDING & ABETTING LIABILITY UNDER
## MINNESOTA SECURITIES ACT
## MINN STAT. §80A.76(g)(3)

91.     Plaintiff incorporates here by reference the allegations made in paragraphs 1 through 78, as if fully here alleged.

92.     Questar, an admitted broker-dealer, is liable under Minnesota Securities Act because Questar "materially aided" DBSI's offer and sale of interests in a Ponzi scheme, including, but not limited to, the DBSI 2008 Notes Corporation offering.

93.     Questar did so by circulating to Plaintiff and the putative class DBSI PPMs and marketing materials that Questar knew, or was reckless or negligent in not knowing, contained material misstatements and omissions of material fact, in violation of the Minnesota Securities Act.

94.     Questar further did so by withholding from its brokers and clients adverse due diligence, *i.e.*, risk information, discovered by due diligence advisors and disclosed to Questar or by misleading its brokers to believe that Questar had conducted adequate due diligence into DBSI when, in fact, Questar had not.

## COUNT FOUR —NEGLIGENCE

95.     Plaintiff incorporates here by reference the allegations made in paragraph 1 through 78, as if fully here alleged.

96.     Upon information and belief, due diligence advisors performed due diligence on DBSI securities offerings offered and sold by Questar, including, but not limited to DBSI 2008 Notes Corporation, and provided Defendant with a due diligence

26635

reports on same.

97.    Upon information and belief, the reports warned, among other things, that DBSI needed audited financials; however, Defendant said nothing to its brokers or its customers.

98.    Questar bore a duty to conduct adequate due diligence into DBSI's securities offerings, including but not limited to DBSI 2008 Notes Corporation. Defendant breached that duty to Plaintiff and all members of the putative class, before promoting, offering, and selling DBSI securities.

99.    Questar failed to reasonably act on information that due diligence advisors provided regarding the full measure of risks associated with securities issued by DBSI's various SPCs.

100.   Additionally, Questar withheld material risk information from investors.

101.   Questar, in the exercise of reasonable due diligence, when made aware that DBSI accounting practices and records keeping did not comply with or facilitate GAAP-compliant accounting, should have demanded access to additional documentation, *e.g.*, bank statements, tax returns, etc., for DBSI's and the various SPCs' representations about their solvency and profitability.

102.   According to the Examiner's Interim and Final Reports, DBSI maintained hundreds of bank accounts, and those account statements made clear two huge red flags: that DBSI's main cash account hovered near a zero balance and often went negative until cash infusions/transfers came from investor proceeds such as those from the DBSI

2008 Notes.  But Questar never asked to see nor reviewed any DBSI bank account statements.  Had Questar done so, the Ponzi scheme at DBSI would have been obvious.

103.   Upon information and belief, due diligence advisors urged Questar to review payments to investors by looking at such things as checks and other source documentation; but, Questar refused.

104.   Questar ignored advice from due diligence advisors as well as guidance provided by FINRA's Notice to Members 03-71 and 10-22.   Questar's acts and omissions are both the factual and proximate cause of the financial loss suffered by Plaintiff and all members of the putative class.

105.   Due diligence discovered that DBSI's financial affairs, internal controls, and accounting pointed towards a Ponzi scheme, but Questar negligently failed to disclose this to Plaintiff or to any member of the putative class, and Questar recklessly or negligently chose to continue selling DBSI securities, both of which are the factual and proximate causes of the financial loss suffered by Plaintiff and all members of the putative class.

106.   Further, Questar negligently failed to independently investigate these red flags, and the individual Defendants negligently failed to ensure that Questar independently investigated these red flags.

107.   Nowhere is Questar's negligence more clear than in its  failure to adhere to FINRA's Notices to Members 03-71 and 10-22.  *See* Exhibit C (FINRA Notice To Members 03-71); Exhibit D (FINRA Notice To Members 10-22).

26635

108.    These Notices remind FINRA members like Questar of their due diligence obligations when selling products like the DBSI notes at issue here.

109.    These Notices clearly establish the industry-wide standard of care regarding due diligence that Defendant should have (but did not) follow.

110.    Among other things, Notice 03-71 requires members like Questar to "provide a balanced disclosure of both risks and rewards associated with a particular product[.]" (Exhibit C at 1).  This, Defendant did not do.

111.    Additionally, Notice 03-71 requires members like Questar to "understand" some "common features of products like DBSI's notes, including the "creditworthiness of the issuer" and the "creditworthiness and value of any underlying collateral." (Exhibit C at 3).

112.    Questar negligently failed to independently investigate these matters.

113.    Contrary to what Questar led investors to believe by omission DBSI was not at all creditworthy, and the underlying collateral, *i.e.*, real estate and technology company investments were greatly overvalued, as explained in the Bankruptcy Examiner's reports on DBSI.

114.    While Notice 03-71 allows members to "in good faith rely on representations . . . contained in a prospectus or disclosure document," (Exhibit C at 4), the Notice cautions that such reliance "may not be sufficient for a member to satisfy its due diligence requirements *where the content of the prospectus or disclosure document does not provide the member with sufficient information to fully evaluate*

26635

*the risk of the product*[.]" (Exhibit C at 4) (Emphasis added).

115.   The DBSI PPMs did not provide Questar with sufficient information to fully evaluate the risk of notes issued by DBSI.

116.   That much should have been clear to Questar, given the lack of audited financials for any DBSI SPC.

117.   That much certainly was clear in the light of due diligence performed by third parties and, upon information and belief, made available to Questar.

118.   Indeed, as Notice 03-71 warned members in 2003, "simply providing a prospectus or offering memoranda does not cure unfair or unbalanced sales or promotional materials, whether prepared by member . . . or issuer."  (Exhibit C at 5).

119.   As the Notice instructs, when a PPM does not contain enough information, the member must undertake due diligence.

120.   Here, upon information and belief, that is just what happened; but here, the due diligence heralded warning signs of a classic Ponzi scheme.

121.   Yet, Questar cast aside the due diligence and concluded that the notes were appropriate for sale without disclosing additional and material risks that third-party due diligence uncovered.

122.   Because Questar withheld from its brokers and its customers the due diligence reports, Questar, by omission, led investors to believe that DBSI notes and securities offered protection against declining markets, because of the purported collateral that allegedly backed the notes.

27

26635

123.   Those statements, however, were neither fair nor accurate.

124.   Questar failed to independently investigate these matters.

125.   These failures violated the standard of care clearly set forth in Notice 03-71.

126.   Upon information and belief, Questar failed to failed to ensure that it "train[ed] registered persons [*i.e.*, the broker] about the . . . risks" of DBSI notes and other securities before QUESTAR allowed the broker to sell said notes to investors.

127.   This failure violated Notice 03-71 and provides still more evidence that QUESTAR acted negligently because, as the notice requires, "members must ensure that they implement appropriate supervisory internal controls and appropriate training to all registered persons who sell such products to customers."  (Exhibit C at 6).  Clearly, Questar did not do that.

128.   These failures by Questar violated the standard of care set by Notice to Members 03-71.

129.   In addition, Questar's negligent failure to adhere to 03-71, the Defendant negligently failed to follow the sound due diligence practices set out in Notice To Members 10-22.

130.   FINRA issued Notice To Members 10-22 to "remind[] broker-dealers of their obligation to conduct a reasonable investigation of the issuer and the securities they recommend" under Reg D.  (Exhibit D at 1).

131.   To that end, Notice 10-22 warns broker-dealers like Questar that Questar

28

"may not rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation."

132.   The Notice also warned the Questar was "required to exercise a 'high degree of care' in investigating and independently verifying an issuer's representations and claims."  (Exhibit D at 4).

133.   Questar negligently failed to heed (and to comply with) both these warnings.

134.    "The fact that [Questar's] customer[], [the Plaintiff here], may be sophisticated . . . does not obviate [Questar's] duty to investigate."  (Exhibit D at 4).

135.   Notice 10-22 establishes that, "at a minimum, [Questar should have conducted] a reasonable investigation concerning:  "the assets held by or to be acquired by [DBSI]," "the claims being made [by DBSI]," and the "intended use of proceeds of the offering."  (Exhibit D at 5).

136.   Upon information and belief, Questar failed to reasonably investigate the assets that DBSI held and that DBSI proposed to acquire.

137.   Questar negligently failed to ensure that it reasonably investigated DBSI's purported inter-company receivables and other assets.

138.   Absent this negligence by Questar, Questar likely would have discovered the irregularities concerning assets held by DBSI, described in paragraphs 23, 25, 46, and in the Examiner's Interim and Final Reports, which are incorporated here by reference.

26635

139.    Upon information and belief, Questar failed to reasonably investigate the claims being made by DBSI.

140.    Upon information and belief, Questar negligently failed to employ reasonable due diligence or investigation practices to ensure that Questar had adequately investigated DBSI before urging Smith and the putative class members to buy the DBSI 2008 Notes and other DBSI-issued securities.

141.    The reasonable practices that Questar failed to employ include, but are not limited to, the following reasonable practices suggested by Notice 10-22:

   a.    Examining historical DBSI's financial statements and those from various DBSI SPCs;

   b.    Inquiring about how DBSI's cash needs might affect other DBSI SPCs' business prospects;

   c.    Inquiring about internal controls DBSI and the various DBSI SPCs;

   d.    Contacting DBSI customers regarding their dealings with DBSI; and the DBSI SPCs, *e.g.*, to see if those SPC's were repaying inter-company loans; and

   e.    Inquiring about past securities offerings from DBSI and the DBSI SPCs and the degree of success or profitability those ventures had enjoyed—had Questar done so, Questar likely would have discovered that, for years, DBSI had not turned a profit.

142.    These negligent failures by Questar stand as both the factual and proximate cause of Plaintiff's and the putative class's losses.  Importantly, these obligations pre-dated Notice 10-22.  These obligations existed during the Class Period. Notice 10-22 merely reminded Questar and reiterated these obligations—obligations

26635

that Questar flouted regarding DBSI and DBSI 2008 Notes Corporation.

## COUNT FIVE—NEGLIGENT MISREPRESENTATION

143.   Plaintiff incorporates here by reference the allegations made in paragraphs 1 through 78, as if fully here alleged.

144.   Questar negligently omitted to disclose to Plaintiff and all members of the putative class that Questar had not conducted adequate due diligence and that Questar's due diligence advisors had learned of red flags. Questar failed to disclose the problems, their risks or implications to the Plaintiff or to any member of the putative class.

145.   And, upon information and belief, Questar's omissions were perpetrated over the objection of its due diligence advisors.

146.   Questar negligently omitted to disclose to Plaintiff and all members of the putative class that DBSI was nothing more than just another Ponzi scheme.

147.   Questar's negligent omissions were substantially the same to Plaintiff and all putative class members.

148.   These negligent misrepresentations were made regarding the profitability and promise of investing in DBSI notes via the misleading omissions in DBSI PPMs that Questar circulated to Plaintiff and members of the putative class.

149.   Plaintiff and all members of the putative class justifiably relied on Questar's negligent omissions, and such reliance can be presumed from this common scheme or course of business.

150.   Questar's negligent omissions caused Plaintiff and the putative class

31

26635

members to suffer great financial harm.

## COUNT SIX—VIOLATION OF THE MINNESOTA SECURITIES ACT, MINN STAT. § 80A.86(3)

151.    Plaintiff here incorporates and realleges paragraphs 1 through 64; 79 through 90; 95-142; and 144 through 150 as if fully alleged herein.

152.    Through Questar's circulating DBSI's misleading offering materials; failure to disclose its lack of due diligence; its negligence; and its negligent misrepresentations, Questar engaged in a practice or course of business that operated as a fraud or deceit upon the Plaintiff and the putative class.

153.    Questar's doing so caused the Plaintiff and the putative class to purchase DBSI securities and to suffer great financial loss.

## COUNT SEVEN—VIOLATION OF THE MINNESOTA SECURITIES ACT, MINN STAT. § 80.76(g)(1)—CONTROL PERSON LIABILITY

### Against Defendants Yorktown Financial Companies, Inc. and Allianz Life Insurance Companies of North America

154.    Plaintiff here incorporates and realleges paragraphs 1 through 64; 79 through 90; 95-142; and 144 through 153 as if fully alleged herein.

155.    According to Questar's regulatory filings with FINRA, Defendants Yorktown Financial Companies and Allianz Life Insurance Companies of North America directly or indirectly control Questar.

156.    Those same regulatory filings admit that both Yorktown and Allianz direct Questar's management and policies.

32

26635

157.    Yorktown's and Allianz's control of Questar vis-à-vis Questar's violation of Minnesota's securities laws render both Yorktown and Allianz liable as control persons.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action, certifying Plaintiff as Class Representative under Rules 23 (b)(3) and Plaintiff's counsel as Class Counsel;

b.      Awarding Plaintiff and the putative class compensatory damages under the Minnesota Securities Act;

c.      Awarding Plaintiff and the putative class compensatory damages for Questar's negligence in ignoring Notices to Members 03-71 and 10-22 when Questar ignored due diligence warnings, and when Questar itself failed to conduct adequate due diligence on DBSI;

d.      Awarding Plaintiff and the putative class compensatory damages for Questar's negligent omissions;

e.      Awarding Plaintiff and the putative class compensatory damages, and all other damages allowable under Minnesota law for Questar's negligent misrepresentations to Plaintiff and the putative class;

f.      Awarding Plaintiff and the putative class pre-judgment interest, costs, and reasonable attorneys' fees under the Minnesota Securities Act;

g.      Awarding Plaintiff a reasonable award for serving as Class Representative;

26635

      h.      Finding Defendants Yorktown and Allianz jointly and severally liable for

Questar's violation of the Minnesota Securities Act; and

      i.      Granting other such relief as this Court deems just and proper.


Dated: October 18, 2012                Respectfully Submitted,


                        s/Daniel E. Gustafson
                        Daniel E. Gustafson (#202241)
                        Karla M. Gluek (#238399)
                        David A. Goodwin (#386715)
                        **Gustafson Gluek PLLC**
                        Canadian Pacific Plaza
                        120 South Sixth Street, Suite 2600
                        Minneapolis, MN 55402
                        Telephone: (612) 333-8844
                        dgustafson@gustafsongluek.com
                        kgluek@gustafsongluek.com
                        dgoodwin@gustafsongluek.com

                        Charles E. Scarlett*
                        Bradford M. Gucciardo*
                        Scott D. Hirsch*
                        **Scarlett & Gucciardo, P.A.**
                        160 S.E. Sixth Avenue, Suite B-2
                        Delray Beach, Florida 33483
                        Telephone: (561) 404-0368
                        cscarlett@scarlettgucciardo.com
                        bgucciardo@scarlettgucciardo.com
                        shirsch@scarlettgucciardo.com

26635

Robert E. Gordon*
Scott L. Adkins*
**Gordon & Doner, P.A.**
4114 Northlake Blvd.
Palm Beach, Florida 33410
Telephone: (561) 333-3333
rgordon@fortheinjured.com
sadkins@fortheinjured.com

*pro hac vice* motions to be filed

***Attorneys for Plaintiff***

26635