## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James W. Smith, Jr., on his own behalf and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Questar Capital Corporation, Yorktown Financial Companies, Inc., and Allianz Life Insurance Companies of North America,<br><br>Defendants. | Case No. 12-cv-2669 (SRN/TNL)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Daniel E. Gustafson, Karla M. Gluek, and David A. Goodwin, Gustafson Gluek PPLC, 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402; Robert E. Gordon, Scott L. Adkins, and Stephen McGuinness, Gordon & Doner, PA, 4114 Northlake Boulevard, Palm Beach, FL 33410; Charles E. Scarlett, Bradford M. Gucciardo, and Scott D. Hirsch, Scarlett Gucciardo & Hirsch, PA, 25 Seabreeze Avenue, 3rd Floor, Delray Beach, FL 33483, for Plaintiff.

Anthony N. Cicchetti, Carlton Fields Jorden Burt, P.A., 175 Powder Forest Drive, Suite 301, Simsbury, CT 06089; Roland C. Goss and James F. Jorden, Carlton Fields Jorden Burt P.A., 1025 Thomas Jefferson Street, NW, Suite 400 East, Washington, DC 20007; and Wendy J. Wildung, Faegre Baker Daniels LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Class Action Complaint ("Amended Complaint"). [Doc. No. 48]. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## II.     BACKGROUND

Plaintiff and putative class representative James W. Smith, Jr. ("Smith") is an investor who resides in Florida and a customer of Defendant Questar Capital Corporation ("Questar").  (Am. Compl. ¶ 15 [Doc. No. 42].)  Questar is a Minnesota corporation with its principal place of business in Minnesota.  (Id. ¶ 16.)  Questar publicly solicited, offered, and sold securities that were issued by non-party Diversified Business Services & Investments, Inc. ("DBSI") and its various subsidiaries and affiliates.  (Id. ¶ 14.)  DBSI is an Idaho corporation with its principal place of business in Idaho.  (Id. ¶ 8.)  A now-defunct Ponzi scheme, DBSI purported to finance the purchase of various real estate ventures.  (Id.)

Defendant Yorktown Financial Companies, Inc. ("Yorktown") is an Indiana corporation with its principal place of business in Minnesota.  (Id. ¶ 16.)  Defendant Allianz Life Insurance Companies of North America ("Allianz") is a Minnesota corporation with its principal place of business in Minnesota.  (Id.)  The Amended Complaint alleges that Yorktown and Allianz "directly or indirectly control Questar."  (Id. ¶ 116.)

On or about February 19, 2008, DBSI 2008 Notes Corporation, a DBSI subsidiary, issued a confidential Private Placement Memorandum ("PPM") for $90,000,000 in corporate notes that bore 9.5% interest ("2008 Notes").  (Id. ¶ 12.)  The marketing materials described the notes as paying 9.5% annually for a period of eight years and being "unconditionally guaranteed" by DBSI Housing Inc.  (Id. ¶ 20, 23.)  They stated that interest was "simple interest paid monthly," and the investor would receive "steady monthly payments from an 8-year Note."  (Id. ¶ 20.)  They further indicated that funds would be used by the DBSI Group of Companies for "locating, acquiring, developing, managing and

providing real estate investment opportunities throughout the country." (Id.)  Moreover,

these materials stated that DBSI had "Debt Experience and Track Record" since 1994.  (Id.)

Between October 2006 and November 2008, Questar disseminated these documents and

brochures to existing and prospective customers.  (Id. ¶ 23.)

In or about February 2008, Smith met with Robert Carlson ("Carlson"), a Questar

representative,[1] at Smith's office in Miami, Florida, to discuss a $50,000 investment

recommended by Carlson to Smith.  (Id. ¶ 21.)  The proposed investment consisted of a note

issued by DBSI 2008 Notes Corporation, represented by Carlson as a safe and conservative

investment.  (Id.)  Carlson assured Smith that DBSI was a well-established company, and

that the note would provide the desired flow of income on a monthly basis, reliably and

without interruption.  (Id.)  Smith purchased one note issued by DBSI 2008 Notes

Corporation for $50,000 ("Smith Note").  (Id. ¶ 15.)

It is alleged that from approximately October 16, 2006 to October 16, 2012,

members of the putative class similarly purchased or acquired DBSI-issued securities from

Questar.  (Id. ¶¶ 11, 23.)

In order to purchase the DBSI 2008 Notes Corporation offering, Questar required

Smith and all members of the putative class to execute a "New Account Form" agreement.

(Id. ¶ 24; New Account Form, Ex. F to Am. Compl. [Doc. No. 42-6 at 2-5].)  Attached to

the New Account Form is a document entitled "Questar Capital Sponsorship Program

---

[1] Whether Carlson was a registered securities broker-dealer or investment advisor at the
time of his meeting with Smith is contested and has yet to be determined.  (See Dec. 8,
2013, Hr'g Tr. at 28-29 [Doc. No. 58]; Pl.'s Opp'n to Defs.' Mot. to Dismiss at 14-16
[Doc. No. 54].)

Disclosure." (Sponsorship Program Disclosure, Ex. F to Am. Compl. [Doc. No. 42-6 at 6].) The Sponsorship Program Disclosure informs the potential investor that Questar "receives compensation from these partners over and above the standard concessions disclosed in the product prospectuses, and that compensation is a material factor in entering into partnership." (Id.)  It further discloses that "[t]his compensation is used to offset the costs of due diligence"—that is, "an in depth due diligence analysis of the product sponsor." (Id.)

In November 2008, DBSI and various subsidiaries and affiliates, including DBSI 2008 Notes Corporation, filed for bankruptcy protection in the District of Delaware. (Am. Compl. ¶ 26 [Doc. No. 42].)  Upon DBSI's collapse, the Bankruptcy Court appointed a Trustee, who sued Questar to claw back approximately $2.2 million in commissions and other fees that DBSI paid to Questar for the sale of DBSI securities. (Id. ¶¶ 3, 53; Zazzali v. Advisory Group Equity Servs. Ltd. et al., No. 1:11-cv-475-GMS (D. Del.).)  The Bankruptcy Court also appointed an Examiner, who filed an Interim Report and Final Report. (Am. Compl. ¶ 54 [Doc. No. 42].)  The Examiner's Interim Report focused on DBSI's misuse of proceeds from the DBSI 2008 Notes Corporation offering. (Id. ¶ 55.) The Examiner's Final Report showed that as early as 2005, DBSI constantly needed new investor funds in order to meet pre-existing obligations. (Id. ¶ 56.)

The Amended Complaint alleges that due diligence reports were readily available to Questar, and they identified warning signs about DBSI. (Id. ¶ 41.)  For example, the law firm of Mick & Associates ("Mick") in Omaha, Nebraska, conducted due diligence on private placement offerings made by DBSI to the public. (Id. ¶ 30.)  Mick completed a due diligence report on the DBSI 2008 Notes Corporation offering on February 1, 2008, revised

4

it on February 14, 2008, and disseminated the revised report to Questar.  (Id.)  The Mick

report gave the DBSI 2008 Notes Corporation offering a "qualified recommendation,"

meaning that there was an element of uncertainty or risk involved in the offering.  (Id. ¶ 30.)

This "qualified recommendation" was not disclosed to Smith or the putative class.  (Id.)

The Mick report purportedly raised other warning signs that Plaintiff argues should

have prompted Questar to undertake its own due diligence, listen to due diligence advisors,

and question the legitimacy of the offering.  (Id. ¶ 31.)  For example:

- The Mick report was not independently audited or otherwise verified, contrary to
  industry practice under FINRA NTM 03-71.  (Id.)

- All of the financial information in the Mick report came directly from DBSI.  (Id. ¶
  32.)  The Amended Complaint alleges that Questar did not verify this financial
  information independently, and it concealed the lack of independent financial
  verification from its customers.  (Id.)

- The interest rate of the DBSI 2008 Notes Corporation at 9.5% was appreciably
  higher than bank CD rates in 2008, which ranged from 3.75% to approximately
  5.3%.  (Id. ¶ 33.)

Additional warning signs allegedly included DBSI's issuance of regular, successive

offerings, and the failure of DBSI's financial statements to comply with Generally Accepted

Accounting Principles ("GAAP").  (Id. ¶¶ 34, 42-44.)

Smith claims that Questar failed to act in several ways, such as not disclosing the

Mick report and the warning signs it contained to Questar's customers; not investigating the

risks with DBSI independently; and not demanding DBSI to amend its PPMs to include risk

disclosures, as urged by due diligence advisors.  (Id. ¶¶ 38, 40.)

The Amended Complaint alleges that Questar knew, or was deliberately reckless or

negligent in not knowing, that their statements were materially false and misleading.  (Id. ¶

47.)  Relying on Questar's representations, Smith and the putative class members sustained

substantial losses in DBSI's now-worthless securities.  (Id. ¶¶ 26, 52.)

On October 18, 2012, Smith filed a Class Action complaint, alleging the following

causes of action: violations of the Minnesota Securities Act under Minnesota Statutes §§

80A.68(1), 80A.68(2), 80A.76(g)(3), 80A.86(3),[2] and 80.76(g)(1) (Counts 1, 2, 3, 6, and 7);

common law negligence (Count 4); and common law negligent misrepresentation (Count 5).

(Compl. [Doc. No. 1].)  On January 2, 2013, Defendants moved to dismiss the Complaint.

(Defs.' Mot. to Dismiss [Doc. No. 29].)  On August 2, 2013, the Court granted in part and

denied in part Defendants' motion to dismiss, specifically:

1.  Granting without prejudice Defendants' motion to dismiss Counts 1, 2, 3, 6, and 7
    of the Class Action Complaint alleging violations of the Minnesota Securities Act;

2.  Granting with prejudice Defendants' motion to dismiss Count 4 of the Class
    Action Complaint alleging common law negligence; and

3.  Granting without prejudice Defendants' motion to dismiss Count 5 of the Class
    Action Complaint alleging common law negligent misrepresentation.

(Aug. 2, 2013, Order at 28 [Doc. No. 41].)

On September 3, 2013, Smith filed an Amended Complaint, alleging the following

causes of action: violations of Minnesota Securities Act under Minnesota Statutes

§§ 80A.68(1), 80A.68(2), 80A.76(g)(4), 80A.68(3), and 80.76(g)(1) (Counts 1, 2, 3, 6,

and 8); common law negligence (Count 4); common law negligent misrepresentation

(Count 5); and common law breach of contract (Count 7).  (Am. Compl. [Doc. No. 42].)

---

[2]  The original Complaint claims a violation of Minn. Stat. § 80A.86(3).  (Compl. at 32
[Doc. No. 1].)  The Court understands this citation to be a typographical error, as the
Amended Complaint claims a violation of Minn. Stat. § 80A.68(3) instead, based on the
same allegations.  (Am. Compl. at 35 [Doc. No. 42].)

On September 30, 2013, Defendants moved to dismiss the Amended Complaint, which Plaintiff opposed on October 21, 2013.  (Defs.' Mot. to Dismiss [Doc. No. 48]; Pl.'s Opp'n to Defs.' Mot. to Dismiss [Doc. No. 54].)  On November 4, 2013, Defendants filed a reply brief.  (Defs.' Reply Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. [Doc. No. 55].)  On December 3, 2013, the Court heard oral argument.  (Min. Entry for Mot. Hr'g [Doc. No. 56].)

## III.   DISCUSSION

Defendants bring this motion under Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Defs.' Mot. to Dismiss at 1 [Doc. No. 48].)

### A.  Standard of Review

Certain claims that include allegations of fraud must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  Claims subject to the particularity requirements must be pled to include "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentations and what was obtained or given up thereby."  Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549 (8th Cir. 1997) (citations omitted).  "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  Id. (citations omitted).  As a general matter, the "who, what, when, where, and how" of any fraud claim must be pled in detail.  Id. at 550 (citations omitted). In the securities fraud context, Rule 9(b) requires that the pleading set forth facts explaining why it is claimed that each of the defendants knew the representations to be untrue or misleading when they were made.  In re Buffets, Inc. Sec. Litig., 906 F. Supp.

1293, 1300 (D. Minn. 1995). The Court is mindful that the issue here is not whether the plaintiff will prevail at trial, but rather whether he is entitled to proceed with his claims. In re Digi Int'l, Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1095 (D. Minn. 1998).

When evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes the facts in the Complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). The Court, however, need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." Id. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under Twombly. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). In short, this standard "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." Twombly, 550 U.S. at 556.

**B. Materials Considered**

A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion

to dismiss under Rule 12(b)(6). <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079

(8th Cir. 1999); <u>see</u> <u>Piper Jaffray Cos., Inc. v. Nat'l Union Fire Ins. Co.</u>, 967 F. Supp.

1148, 1152 (D. Minn. 1997) (finding that on a motion to dismiss, "the Court simply may

not . . . resolve factual disputes on the basis of preemptive (and untested) submissions"

and may only "consider extra-pleading material necessarily embraced by the pleadings . .

. and all documents they incorporate by reference").

For purposes of this motion, materials embraced by the Amended Complaint

include: (1) the DBSI 2008 Notes Corporation Private Placement Memorandum

("PPM"), (2) the DBSI 2008 Notes Corporation Subscription Agreement ("Subscription

Agreement"), (3) the Questar Capital New Account Form ("New Account Form"), and

(4) the Questar Capital Sponsorship Program Disclosure ("Sponsorship Program

Disclosure"). (Private Placement Memorandum, Ex. A to Aff. of Anthony N. Cicchetti

[Doc. No. 19-1]; Subscription Agreement, Ex. C to Cicchetti Aff. [Doc. No. 19-3]; New

Account Form and Sponsorship Program Disclosure, Ex. F to Am. Compl. [Doc. No. 42-

6].) The Court considers the PPM because it is referenced in the Amended Complaint

and forms the basis of the dispute. (<u>E.g.</u>, Am. Compl. ¶¶ 12, 28, 40, 45-49 [Doc. No.

42].) The Court considers the Subscription Agreement despite its lack of reference in the

Amended Complaint, because it forms the basis of the dispute. The Court considers the

New Account Form because it is referenced in and attached to the Amended Complaint,

and it forms the basis of the dispute. (<u>Id.</u> ¶¶ 7, 24, 25, 111-14 [Doc. No. 42].) Finally,

the Court considers the Sponsorship Program Disclosure because it is referenced in and

attached to the Amended Complaint, and it forms the basis of the dispute. (<u>Id.</u> ¶¶ 24,

110.)

**C. Rule 9(b)**

Defendants argue that Smith's allegations of Questar's omissions or misrepresentations do not meet the heightened pleading standard of Rule 9(b).  (Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 23-25 [Doc. No. 50].)  Smith responds that he has complied fully with Rule 9(b) because the Amended Complaint pleads "numerous additional factual allegations . . . that enumerate the time, place, and content of the misrepresentations made to Plaintiff."  (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 9-13 [Doc. No. 54].)

Previously, the Court concluded that the original Complaint failed to plead sufficiently the circumstances of Questar's fraud with respect to three categories: (1) Questar's alleged failure to heed due diligence advisors or adequately perform due diligence; (2) Questar's alleged distribution, offering, and sale of DBSI-issued securities through materially misleading PPMs and marketing materials; and (3) Questar's alleged assurances to Smith and the putative class members about the soundness of DBSI securities.  (Aug. 2, 2013, Mem. Op. and Order at 9-10 [Doc. No. 41].)

Assuming all facts in the Amended Complaint to be true, and construing all reasonable inferences from those facts in the light most favorable to Smith, the Court finds that the Amended Complaint sufficiently pleads fraud.  First, regarding Questar's alleged failure to heed due diligence advisors or adequately perform due diligence, the Amended Complaint elaborates on the due diligence report that Mick & Associates conducted.  It is alleged that:

- Mick & Associates completed a due diligence report on February 1, 2008, revised it on February 14, 2008, and distributed the revised report to various FINRA brokers/dealers, including Questar.  (Am. Compl. ¶ 30 [Doc. No. 42].)  Although this report gave the DBSI 2008 Notes Corporation a "qualified recommendation," putting the broker/dealer on notice that the offering was not necessarily safe or conservative, the recommendation was not disclosed to Smith or the putative class members.  (Id.)  Questar allegedly ignored the "qualified recommendation" entirely, as well as concerns voiced by its due diligence advisors.  (Id.)

- The Mick report raised additional warning signs that should have, but did not, prompt Questar to undertake its own due diligence.  (Id. ¶ 31.)  For example, the Mick report was not independently audited or otherwise verified.  (Id.)  Also, all of the financial information in the Mick report came directly from DBSI, and Questar did not independently verify this information.  (Id. ¶ 32.)

- The Mick report raised the possibility of Ponzi scheme activity by DBSI, given that the interest rate of the DBSI 2008 Notes Corporation at 9.5% was appreciably higher than bank CD rates paid in 2008, which ranged from 3.75% to approximately 5.3%.  (Id. ¶ 33.)

- The Mick report and the warning signs it contained were not disclosed to Questar's customers.  (Id. ¶ 38.)

Although the Amended Complaint refers to due diligence reports in the plural while identifying only the Mick report, the Court recognizes the difficulty in pleading securities fraud with particularity in the absence of pre-trial discovery.  Without access to any of the due diligence reports at this time, Smith appears to have done his best to identify the contents of the Mick report using available resources, such as the Bankruptcy Examiner's reports.  (Dec. 3, 2013, Hr'g Tr. at 27 [Doc. No. 58].)  The Amended Complaint alleges when the Mick report was compiled, revised, and distributed; the report's mention of a Ponzi scheme; and that Questar ignored such warnings.  Plaintiff's pleading is sufficiently particularized.

Second, regarding Questar's alleged distribution, offering, and sale of DBSI-

issued securities through materially misleading PPMs and marketing materials, the Amended Complaint identifies when, where, and by whom the PPM and other materials were transmitted to Smith and the putative class members.  It is alleged that in or about February 2008, Smith met with Robert Carlson, a Questar representative, at Smith's office in Miami, Florida, to discuss a $50,000 investment recommended by Carlson to Smith.  (Am. Compl. ¶ 21 [Doc. No. 42].)  This proposed investment was a note issued by DBSI 2008 Notes Corporation.  (Id.)  The offering PPM and marketing documents were given to Smith at approximately the same time and location.  (Id. ¶ 28.)  It is also alleged that between October 2006 and November 2008, Questar registered representatives similarly distributed DBSI-issued documents and brochures to current and prospective customers, including putative class members.  (Id. ¶¶ 23, 28.)  Such pleading is sufficiently particular.

Third, regarding Questar's alleged assurances to Smith and the putative class members about the soundness of DBSI securities, the Amended Complaint pleads the following:

- When Smith met with Carlson in or about February 2008 at Smith's Miami office, Carlson represented the DBSI-issued $50,000 note to be a safe and conservative investment.  (Id. ¶ 21.)  Carlson also assured Smith that DBSI was a well-established company, and that the note would provide the desired income flow on a monthly basis, reliably and without interruption.  (Id.)

- Other Questar registered representatives similarly advised putative class members across the nation—that the notes would provide reliable income with no volatility.  (Id.)

- Between October 2006 and November 2008, Questar registered representatives distributed DBSI-issued documents and brochures to current and prospective customers.  (Id. ¶¶ 23, 28.)  The brochures stated that the notes were

12

"unconditionally guaranteed by DBSI Housing Inc." and would pay "steady monthly payments."  (Id. ¶ 23.)

Because the Amended Complaint identifies the time, place, and content of Questar's assurances, as well as by and to whom they were made, the Court finds such pleading to be sufficiently particular.

For these reasons, Smith's allegations of fraud against Questar meet the heightened pleading standard of Rule 9(b).

### D.  Omission Claims

Plaintiff argues that this case involves more than actionable omissions by Defendants, but also their misrepresentations and other wrongdoings.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 34 [Doc. No. 54]; Dec. 8, 2013, Hr'g Tr. at 33 [Doc. No. 58].) Recognizing the breadth of Plaintiff's claims, the Court nonetheless considers Defendants' argument that Smith's "omission claims" fail as a matter of law, because the DBSI-issued PPM disclosed the circumstances that Plaintiff claims Questar allegedly withheld from or misrepresented to Smith and the putative class members.  (Dec. 8, 2013, Hr'g Tr. at 15-17 [Doc. No. 58]; Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 24-25 [Doc. No. 50].)  Defendants emphasize that the PPM disclosed the following matters: (1) the "highly speculative" nature of investing in the 2008 Notes; (2) that the 2008 Notes offering was the latest of a number of regular and successive offerings by DBSI; (3) that the financial statements of DBSI Housing, Inc. were and would be unaudited; (4) that the asset valuations in the financial statements were prepared by DBSI personnel, not independently audited, and may not reflect market

value; and (5) that the financial statements were not in conformity with Generally

Accepted Accounting Principles.  (Id. at 18-20.)

The Amended Complaint presents Questar's alleged omissions slightly differently.

It primarily focuses on four omissions, that: (1) "DBSI's due diligence agent issued a

'qualified report' on the underlying securities"; (2) "DBSI's assets were never

independently audited—all available financial information came from DBSI directly"; (3)

"DBSI had issued regular and successive securities offerings"; and (4) "DBSI's financial

statements were not maintained in compliance with GAAP."  (Am. Compl. ¶¶ 73, 82, 103

[Doc. No. 42].)  In addition, the Amended Complaint alleges that Questar "failed to

detect and disclose" various accounting failures by DBSI:

    a. Generally, DBSI's financial records and accountings are unreliable because
       the records did not comply with GAAP because of fraudulent practices as
       inflated and overstated values on collateral and receivables;

    b. DBSI's grossly over-valuing its investments in various technology
       companies;

    c. DBSI's grossly over-valuing its assets and collateral;

    d. DBSI's use of DRR ("DBSI Redemption Reserve") as an intermediary to
       accumulate cash from various offerings and then transfer that cash as
       needed to other DBSI entities—DRR purportedly existed as a partnership,
       but according to the Examiner, no partnership agreement exists for this
       entity . . . .

(Id. ¶ 44.)

Regarding the first alleged omission, nowhere does the PPM disclose any due

diligence reports that gave the DBSI 2008 Notes Corporation offering a "qualified

recommendation."  Any claim based on this omission therefore survives.

Any claim based on the alleged omission that "DBSI's assets were never independently audited" also survives.  Although Defendants accurately identify the PPM's disclosure that the "Guarantor's [DBSI Housing, Inc.] financial statements are not required to be audited," they overlook the remainder of the same paragraph that states,

> The Company [DBSI 2008 Notes Corporation] will be audited annually by an independent certified public accounting firm beginning with year-end 2008.  The report from that annual audit will be made available to the Noteholders of record upon request.

(Private Place Memorandum at 11, Ex. A to Cicchetti Aff. [Doc. No. 19-1].)  Because Smith has framed this omission with respect to DBSI generally, without distinguishing between DBSI 2008 Notes Corporation and DBSI Housing, Inc., it is arguable that any lack of audit for DBSI 2008 Notes Corporation was not disclosed.

For the same reason, any claim based on the alleged omission that "DBSI's financial statements were not maintained in compliance with GAAP" survives. Defendants accurately identify the PPM's disclosure that

> In preparing the financial statements the Company [DBSI Housing, Inc.] normally follows accounting principles generally accepted in the United States of America ("GAAP"), however, not all of the principles used in preparing the financial statements are in conformity with GAAP.

(Id. at B-4.)  Because Smith has framed this alleged omission without distinguishing between DBSI 2008 Notes Corporation and DBSI Housing, Inc., it is arguable that any failure to maintain DBSI 2008 Notes Corporation's financial statements in compliance with GAAP principles was not disclosed.

By contrast, any claim based on the alleged omission that "DBSI had issued regular and successive securities offerings" cannot survive, because the PPM disclosed

this very fact.  See Sable v. Southmark/Envicon Capital Corp., 819 F. Supp. 324, 333

(S.D.N.Y. 1993).  "The naked assertion of concealment of material facts which is

contradicted by published documents which expressly set forth the very facts allegedly

concealed is insufficient to constitute actionable fraud."  Id. (citations omitted).  Here, the

PPM discloses:

> Q:    What is DBSI Group of Companies' experience with Note offerings?
>
> A:     As of December 31, 2007, DBSI Group has retired 8 of 15 prior debt
> offerings and as of the date of this Memorandum has an outstanding
> balance of $211 million.  DBSI Group plans to retire three additional debt
> offerings by the end of 2008, resulting in 11 of the 15 prior debt offerings
> being retired and equates to nearly $127 million of retired debt.  More than
> $20 million in debt was retired through operation capital in 2007, with an
> additional estimated $41 million expected to be retired in 2008.  If retired
> as planned, in 2008, about 74% of all pre-2005 debt of this type will have
> been retired by DBSI Group.

(Id. at 13.)  This disclosure addresses the DBSI Group of Companies as a whole, and the

issuance of regular and successive securities offerings by DBSI.  Accordingly, the Court

dismisses any claim based on this particular alleged omission.

### E.  Minnesota Securities Act

Defendants argue that Counts 1, 2, 3, 6, and 8 of the Amended Complaint, which

assert claims under the Minnesota Securities Act, should be dismissed for failure to state

a claim because the Minnesota Securities Act does not apply.  (Defs.' Mem. of Law in

Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 25 [Doc. No. 50].)

They submit that the following allegations, asserted for the first time in the Amended

Complaint, enable the Court to conclude that the offer and sale of the Smith Note

occurred outside Minnesota:

16

- Questar disseminated the DBSI-issued PPM and brochures for the 2008 Notes to representatives, including Robert Carlson.  (Am. Compl. ¶ 23.)

- In or about February 2008, Carlson met with Smith in Miami, Florida, where Carlson recommended that Smith invest in the Smith Note, assured Smith of the soundness of DBSI securities, and gave Smith the allegedly misleading marketing materials for the 2008 Notes.  (Id. ¶¶ 21, 28.)

- Carlson provided Smith the PPM for the 2008 Notes in Florida.  (Id. ¶ 28.)

- Questar is licensed as a FINRA member firm in all fifty states.  Putative class members purchased DBSI 2008 Notes Corporation securities through Questar registered representatives, who were licensed in the state in which the putative class members resided.  (Id. ¶ 29.)

(Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 25-26 [Doc. No. 50].)  Defendants emphasize that Smith executed his Subscription Agreement in Florida on February 21, 2008, and the purchase of this note was not effective unless and until DBSI accepted the subscription at DBSI's office in Idaho.  (Id. at 27-28.)  Defendants conclude that the conduct effecting the offer and sale of the Smith Note occurred in Florida and Idaho, not in Minnesota.  (Id. at 28.)

Smith responds that the proper inquiry is where the offer originated, and the offer to invest in the DBSI notes originated in Minnesota from Questar.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 14-15 [Doc. No. 54].)  Smith argues that Carlson, as a representative for Questar, was not a broker-dealer authorized to make the offer, and therefore Carlson was acting as an agent for Questar.  (Dec. 8, 2013, Hr'g Tr. at 28-29 [Doc. No. 58].)  Smith contends that discovery will develop facts underlying the details of the Questar offering process, enabling Smith to show that the Minnesota Securities Act in fact applies to the claims in the Amended Complaint.  (Id. at 16-17.)

17

Minnesota Statute § 80A.87 addresses whether an offer to sell or to purchase a

security is made in Minnesota.  Section (c) of this statute provides in relevant part:

> **Offers in this state.**  For the purpose of this section, an offer to sell or to
> purchase a security is made in this state, whether or not either party is then
> present in this state, if the offer:
>
> (1) originates from within this state; or
>
> (2) is directed by the offeror to a place in this state and received at the place
>     to which it is directed.

MINN. STAT. § 80A.87(c).  The proper inquiry, therefore, is where the offer originated—

not where most of the events or contacts occurred, as Defendants urge.  See id. §

80A.87(c)(1).  At this procedural posture, the Court lacks a sufficient record to make

such a determination.  The Court agrees with Smith that discovery is necessary to

develop a complete record on the offer in this case and whether Carlson acted as an agent

for Questar, after which Defendants may renew their argument by way of summary

judgment, if appropriate.  Accordingly, the Court denies Defendants' motion to dismiss

Counts 1, 2, 3, 6, and 8 of the Amended Complaint for failure to state a claim under the

Minnesota Securities Act.

### F.  Tort Claims

Smith brings the tort claims of negligence (Count 4) and negligent

misrepresentation (Count 5).  (Am. Compl. ¶¶ 90-99, 100-107 [Doc. No. 42].)

Defendants argue that Smith's breach-of-contract claim (Count 7) bars the tort claims,

because the tort claims are "based upon an alleged breach of a duty regarding due

diligence created by the contract."  (Defs.' Mem. of Law in Supp. of Their Mot. to

Dismiss the First Am. Class Action Compl. at 29 [Doc. No. 50].)  Smith disagrees,

contending that Questar violated a duty "to execute all instructions expressly given it by

its customers and a duty to avoid fraudulent conduct," which was independent of any

contractual duty.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 21 [Doc. No. 54].)

A plaintiff cannot recover damages in tort for an alleged breach of contract, except

in "exceptional cases where the defendant's breach of contract constitutes or is

accompanied by an independent tort."  TCF Nat'l Bank v. Mkt. Intelligence, Inc., No. 11-

2717, 2012 WL 3031220, at *4 (D. Minn. July 25, 2012) (citations omitted).  The mere

existence of a commercial contract, however, does not necessarily preclude the

possibility of a tort claim.  Id.  A tort is independent from a breach of contract, therefore

enabling a separate cause of action to be brought, "if a relationship would exist which

would give rise to the legal duty without enforcement of the contract promise itself."  Id.

The Court declines to dismiss Smith's tort claims under the independent duty rule,

because neither tort claim necessarily relies on a duty created by any contract.

Nonetheless, the negligence claim fails for different reasons explained below.  The

negligent misrepresentation claim, by contrast, survives.

### 1.  Negligence

Defendants argue that Smith cannot bring a negligence claim because the Court

already dismissed such a claim in its August 2, 2013, Order.  (Defs.' Mem. of Law in

Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 30 [Doc. No. 50].)

Smith responds that the negligence claim brought here is an entirely new claim—one not

based on FINRA rules and regulations, but rather, on a "duty of care to follow the

instructions of the client and to avoid fraudulent conduct." (Dec. 8, 2013, Hr'g Tr. at 30

[Doc. No. 58]; Pl.'s Opp'n to Defs.' Mot. to Dismiss at 21 [Doc. No. 54].)

Defendants agree that a failure to follow specific instructions expressly given can

create a cause of action, but argue that Smith has not pled such instructions adequately.

(Dec. 8, 2013, Hr'g Tr. at 8-10 [Doc. No. 58].) Defendants also contend that the

purportedly new basis for Smith's negligence claim is simply an attempt to recast the

duty of due diligence that this Court already rejected as a basis for a common law

negligence claim. (Id. at 9, 37.)

Previously, the Court dismissed the negligence claim because Smith "ha[d] not

identified a legal duty owed by Defendants by relying only upon FINRA's Regulatory

Notice to Members 03-71 and 10-22." (Aug. 2, 2013, Mem. Op. and Order at 24 [Doc.

No. 41].) The Amended Complaint continues to rely, at least in part, on these regulatory

notices as a basis for a legal duty. Paragraph 22, for example, alleges that Questar

> fail[ed] to discharge the standard of care imposed upon it by the Financial
> Industry Regulation Authority ("FINRA") Conduct Rules, Notices to
> Members and Regulatory Notices, such as FINRA Notice to Members 03-
> 71 ("NTM 03-71"). NTM 03-71 imposes the duty upon a FINRA
> broker/dealer to discharge its due diligence obligations prior to offering for
> sale private placements such as the DBSI 2008 Notes Corporation offering.

(Am. Compl. ¶ 22 [Doc. No. 42].) Similarly, paragraph 94 alleges:

> The duty of care and to avoid fraudulent conduct that Questar owed to the
> Plaintiff and the class members . . . arise not only from Minnesota state law,
> but from the regulations, customs and usage of the brokerage trade,
> including rules promulgated by the Securities and Exchange Commission
> and by the NASD/FINRA, a self-regulatory organization to which Questar
> belongs and whose rules it must obey.

(Id. ¶ 92.) The Court stands by its prior ruling that there is no basis to create such a

common law duty in this heavily regulated area of the law.  (Aug. 2, 2013, Mem. Op. and Order at 24 [Doc. No. 41].)  As explained in the August 2, 2013, Order, "courts have rejected efforts to derive causes of action from securities regulations based on a negligence standard," and Smith "fail[ed] to identify any negligence case finding that a duty of due diligence exists between a broker-dealer and a purchaser of securities."  (Id.)

Smith now ventures a new theory for the negligence claim, one based on a "duty of care to follow the instructions of the client and to avoid fraudulent conduct."[3]  (Dec. 8, 2013, Hr'g Tr. at 30 [Doc. No. 58]; see Am. Compl. ¶¶ 1, 7, 22, 25, 92 [Doc. No. 42].) Smith elaborates that

> . . . because securities offered for sale by criminal enterprises are unsuitable and inappropriate for all investors . . . inherent in all instructions given to a stockbroker by his or her customer, including the Plaintiff and the putative class members, is a directive to invest their funds in securities that are not issued by entities involved in criminal activities such as a Ponzi scheme.

(Am. Compl. ¶ 22 [Doc. No. 42].)  Smith also alleges that the New Account Form "creates a special agreement by which Questar expressly obligates itself to perform its own in depth due diligence analysis."  (Id. ¶ 25.)

"[A]bsent a special agreement to the contrary, a broker owes her customer only the duty to exercise due care in executing all instructions expressly given to her," and breach of this duty may give rise to a negligence claim.  Minneapolis Employees Ret. Fund v. Allison-Williams Co., 519 N.W.2d 176, 182 (Minn. 1994).  The Amended Complaint, however, does not allege specific instructions that were expressly given to Questar.

---

[3]  Smith has not identified any case law in support of a negligence claim based on a duty to avoid fraudulent conduct in this context.  (See Dec. 8, 2013, Hr'g Tr. at 31 [Doc. No. 58].)

Paragraph 22 broadly concludes that "because securities offered for sale by criminal enterprises are unsuitable and inappropriate for all investors," the plaintiffs' directive to Questar "to invest their funds in securities that are not issued by entities involved in criminal activities" is "inherent in all instructions given to a stockbroker by his or her customer."  (Am. Compl. ¶ 22 [Doc. No. 42].)  The language of "inherent in all instructions" does not equate to "instructions expressly given."  Similarly, the New Account Form does not identify any instructions that were expressly given by Smith or members of the putative class to Questar.  The relevant section of the New Account Form is the Sponsorship Program Disclosure, which notes that Questar receives compensation from strategic partners to "offset the costs of due diligence" and other expenses. (Sponsorship Program Disclosure, Ex. F to Am. Compl. [Doc. No. 42-6 at 6].)  Nowhere does the Sponsorship Program Disclosure identify any express instructions from Smith or putative class members to Questar.  Thus, although a broker's failure to execute all instructions expressly given to him may, in theory, create a negligence cause of action, Smith has not alleged any specific instructions expressly given by him or members of the putative class to Questar to sustain a negligence claim.

For these reasons, the Court grants Defendants' motion to dismiss Questar's common law negligence claim.

### 2.  Negligent Misrepresentation

#### a.  Statute of Limitations

Defendants argue that under a choice-of-law analysis, Florida law governs the negligent misrepresentation claim and a four-year statute of limitations applies.  (Defs.'

Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action Compl. at 31 [Doc. No. 50].)  Defendants contend that the limitations period began to run upon Smith's receipt of the DBSI-issued PPM in February 2008, because the PPM's disclosures put Smith on inquiry notice as to whether Questar fulfilled its obligations to him.  (Id. at 32.)  Smith filed the original Complaint on October 18, 2012, and Defendants argue that his negligent misrepresentation claim is time-barred.  (Id.)

Smith responds that Minnesota law applies to the negligent misrepresentation claim, under which a six-year statute of limitations applies and does not bar his claim. (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 25 [Doc. No. 54].)  Smith also argues that whether he should have had any concerns about Questar's due diligence after reading the DBSI-issued PPM is a fact-intensive inquiry that requires discovery and evaluation by a jury.  (Id. at 27.)

In the absence of discovery and a fuller record, the Court does not choose to analyze the choice of law applicable to this issue at this time.  Moreover, even if Florida law is found to apply at a later stage of this litigation, the Court cautions Defendants that the PPM, alone, is insufficient to show that Smith had any claim against Questar beyond Florida's four-year limitations period.  Issued by DBSI 2008 Notes Corporation, the PPM does not disclose any wrongdoings by Questar.  (Private Placement Memorandum, Ex. A. to Cicchetti Aff. [Doc. No. 19-1].)  Because Smith has sued Questar and not DBSI, the key inquiry is when Smith knew that he had a negligent misrepresentation claim against Questar—not any DBSI entity.  Thus, Defendants' motion to dismiss this claim is denied without prejudice.

23

### b. Pleading Negligent Misrepresentation

The parties further contest whether Smith states a claim for negligent

misrepresentation.  Defendants argue that Questar had no duty to disclose the omissions

in the DBSI-issued PPM because: (1) Smith has not alleged a fiduciary relationship,

which would create such a duty; (2) Smith waived any claims against anyone except

DBSI 2008 Notes Corporation via the Subscription Agreement; (3) Smith's reasonable

reliance was impossible based on his representations in the Subscription Agreement and

the disclosures in the PPM; and (4) DBSI's conduct is an intervening cause of Smith's

damages that precludes a finding of proximate causation.  (Defs.' Mem. of Law in Supp.

of Their Mot. to Dismiss the First Am. Class Action Compl. at 33-35 [Doc. No. 50].)

Smith argues that he has pled sufficiently a negligent misrepresentation claim against

Questar.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 29-34 [Doc. No. 54].)

To state a claim for negligent misrepresentation, Smith must allege: (1) a

misrepresentation of material fact; (2) the defendant either knew of the misrepresentation,

made the misrepresentation without knowledge of its truth or falsity, or should have known

the representation was false; (3) the defendant intended to induce another to act on the

misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the

misrepresentation.[4]  Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784, 786

(Fla. Dist. Ct. App. 1993); see Florenzano v. Olson, 387 N.W.2d 168, 173-74 (Minn. 1986)

---

[4] The Court need not decide whether Minnesota or Florida law applies because the elements
for negligent misrepresentation in both states are similar.  See Leonards v. S. Farm Bureau
Cas. Ins. Co., 279 F.3d 611, 612 (8th Cir. 2002) (finding it unnecessary to resolve a choice-
of-law conflict when the relevant legal principles were the same in both states at issue).

(noting that negligent misrepresentation has the same elements as fraud, except that negligent misrepresentation lacks the intent element).  The heightened pleading requirement under Rule 9(b) of the Federal Rules of Civil Procedure applies to such a claim, whether in Minnesota or Florida.  See Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010); Lamm v. State St. Bank & Trust Co., 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012).

Previously, the Court found that Smith's claim for negligent misrepresentation did not meet the heightened pleading standards of Rule 9(b), because the original Complaint did not sufficiently describe: (1) Questar's alleged failure to heed due diligence advisors or adequately perform due diligence; (2) the DBSI-issued PPM and other offerings, sales, and marketing or advertising materials; or (3) assurances to investors that DBSI securities were sound investments.  (Aug. 2, 2013, Mem. Op. and Order at 26 [Doc. No. 41].)  The Amended Complaint, however, meets the particularity requirements of Rule 9(b) with respect to these categories.  See supra Part III(C).

The Court now considers whether Smith has pled a claim for negligent misrepresentation with sufficient particularity.  First, misrepresentations of material fact are alleged via the advice and offering materials given by Questar registered representatives to Smith and the putative class, regarding the soundness of DBSI offerings.  (E.g., Am. Compl. ¶¶ 21, 23, 28 [Doc. No. 42].)  Second, the Amended Complaint alleges that Questar knew of the misrepresentations or should have known of their falsity, given the due diligence reports and other indicia of fraudulent activity.  (Id. ¶ 35, 42, 47.)  Third, the Amended Complaint alleges that Questar disseminated DBSI-issued offering documents, which induced investors to believe that the DBSI-issued notes

were safe and conservative investments, despite Questar's knowledge to the contrary. (Id. ¶ 23.)  Fourth, the Amended Complaint alleges that Smith and the putative class members suffered "great financial harm" from Questar's misrepresentations, upon which they justifiably relied.  (Id. ¶¶ 106-107.)  With all four elements so pled, the Amended Complaint states a claim for negligent misrepresentation.

As for Defendants' additional arguments, the Court considers whether Questar had any duty to disclose the alleged omissions in the DBSI-issued PPM.  As a general rule, one party to a transaction has no duty to disclose material facts to the other, unless: (1) there existed a fiduciary or confidential relationship between the parties; (2) one party was in possession of special facts that could not have been discovered by the other; or (3) one party who chooses to speak omits information so as to make the information actually disclosed misleading.  Sailors v. N. States Power Co., No. 4-02-253, 1992 WL 532172, at *9 (D. Minn. July 13, 1992) (citing Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 622 (Minn. 1972)); see Ramel v. Chasebrook Constr. Co., 135 So. 2d 876, 882 (Fla. Dist. Ct. App. 1962) (noting that one exception to the general rule is that "nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact").  Although the Amended Complaint does not allege a fiduciary or confidential relationship between Questar and Smith or the putative class, it alleges that Questar possessed due diligence reports at the time of the offering, which gave Questar "reason to believe . . . that DBSI was a Ponzi scheme and all notes it issued were doomed to default as a result."  (E.g., Am. Compl. ¶ 23 [Doc. No. 42].)  At oral argument, Smith confirmed that he did not have access to these reports.  (Dec. 8,

2013, Hr'g Tr. at 27 [Doc. No. 58].)  The Amended Complaint also alleges that Questar "distributed offering materials that it had reason to believe contained untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made . . . not misleading."  (Id. ¶ 26.)  Thus, the Amended Complaint adequately pleads a duty of care under these facts.[5]

As to whether Smith waived any claims against anyone except DBSI 2008 Notes Corporation, such a fact-intensive question is inappropriate to resolve on a motion to dismiss.

Additionally, the Court considers Defendants' argument that Smith's reasonable reliance was impossible based on his representations in the Subscription Agreement and the disclosures in the PPM.  This inquiry is similarly fact intensive.  Defendants' position is undermined by Carlson's certification in the Subscription Agreement, on behalf of Questar, that "the investor has been informed of all pertinent facts relating to the liquidity and marketability of an investment in the Notes during the term of the investment."  (Id.) Additionally, the Sponsorship Program Disclosure states that Questar conducts "an in

---

[5]  In the context of negligent misrepresentation, a duty of care arises when a person supplies information "for the guidance of others in the course of a transaction in which [he] has a pecuniary interest, or in the course of one's business . . . ."  Syverson v. FirePond, Inc., 383 F.3d 745, 749 (8th Cir. 2004); see Osorio v. State Farm Bank, F.S.B., No. 13-10951, 2014 WL 1258023, at *15 (11th Cir. Mar. 28, 2014) (noting that Florida follows the Restatement (Second) of Torts with respect to negligent misrepresentation). The Amended Complaint alleges that Questar representatives advised Smith and the putative class members about DBSI investments, and distributed DBSI-issued offering documents and brochures to them.  (E.g., Am. Compl. ¶¶ 20, 21, 23 [Doc. No. 42].)  It also alleges that Questar had a pecuniary interest ("pursuit of lucrative commissions and fees") in distributing, offering, and selling DBSI securities.  (Id. ¶ 7.)  Therefore, the Amended Complaint sufficiently pleads a duty of care owed by Questar to Smith and the putative class.

depth due diligence of the product sponsor [DBSI]," and Questar "receives compensation from these partners [DBSI] over and above the standard concessions disclosed in the product prospectuses," which is "used to offset the costs of due diligence . . . ." (Sponsorship Program Disclosure, Ex. F to Am. Compl. [Doc. No. 42-6 at 6].)  As for the disclosures in the PPM, not all of Questar's alleged omissions are disclosed as Defendants claim.  See supra Part III(D).  Defendants' reliance argument, therefore, does not dispose of the negligent misrepresentation claim at the pleading stage.

Finally, the Court considers Defendants' argument that DBSI's conduct precludes a finding of proximate causation.  Defendants cite Michael S. Rulle Family Dynasty Trust v. AGL Life Assurance Co., No. 10-231, 2010 WL 3522135, at *5 (E.D. Pa. 2010) for its language that "[t]he problem with Plaintiff's negligent misrepresentation claim is that the record clearly indicates that Defendant did not make the ultimate decision to invest with Madoff[,] and it was Madoff's illegal acts that caused a decrease in the value of the investment account."  This case, however, is distinguishable, because the amended complaint contained "no well-pled allegations that Defendant made any false statements, let alone that it was aware, or should have been aware that it made any false misrepresentations."  Id.  By contrast, Smith has pled sufficiently: (1) Questar's alleged failure to heed due diligence advisors or adequately perform due diligence; (2) the DBSI-issued PPM and other offerings, sales, and marketing or advertising materials; and (3) assurances to investors that DBSI securities were sound investments, despite potential knowledge to the contrary.  See supra Part III(C).

For all of these reasons, the Court finds that the negligent misrepresentation claim

is adequately pled, and Defendants' motion to dismiss Count 5 of the Amended

Complaint is denied.

### G. Breach of Contract

Smith's breach-of-contract claim alleges that: (1) "Plaintiff and all class members

signed a 'New Account Form' agreement.  Incorporated into the New Account Form is

[a] special agreement entitled 'Questar Capital Sponsorship Program Disclosure,'

wherein Questar agrees to the duty to perform 'in depth due diligence analysis' on

products it offers, including the DBSI notes"; (2) "the 'New Account Form' is a valid and

enforceable contract"; (3) "the 'New Account Form' was supported by valid

consideration because Plaintiff and the class members fully performed their obligations

under the contracts and paid Questar fees to serve as agent and advisor for their

accounts"; (4) "Questar breached the 'New Account Form' by its negligent and/or willful

failure to perform proper due diligence on the DBSI 2008 Notes Corporation offering as

contractually agreed to"; and (5) "[a]s a direct, foreseeable, and proximate result of

Questar's breach of contract, Plaintiff and the putative class members suffered great

financial harm."  (Am. Compl. ¶¶ 110-115 [Doc. No. 42].)

Defendants argue that to the extent the New Account Form includes an agreement

between Questar and a customer, that agreement is embodied by page four of the New

Account Form only and excludes the Sponsorship Program Disclosure, which is on page

five.  (Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the First Am. Class Action

Compl. at 35-36 [Doc. No. 50].)  Defendants maintain the Sponsorship Program

Disclosure is not an agreement that could form the basis of a contract.  (Id. at 36.)

Smith responds that the consecutive page numbering of the New Account Form (pages one through four) and the Sponsorship Program Disclosure (page 5) sufficiently shows that the agreement consists of five pages, and the disclosure document expressly states Questar's duty to perform due diligence.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss at 37 [Doc. No. 54].)

At the motion-to-dismiss stage, the question is whether Smith adequately pled a claim for breach of contract.  This claim has four elements: (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of that contract, and (4) resulting damages.  Niagara Foods, Inc. v. Ferguson  Elec. Serv. Co., Inc., 975 N.Y.S. 2d 280, 282 (N.Y. App. Div. 2013).[6]  Currently, the Amended Complaint pleads sufficient facts to support a claim for breach of contract.

For now, the Court declines to determine what documents constitute the contract (i.e., whether the Sponsorship Program Disclosure forms a basis for the contract) or to construe the terms of any contract (i.e., regarding the scope of due diligence promised by Questar in the Sponsorship Program Disclosure), because the factual record is far from fully developed.  See Brown Bros. Elec. Contractors Inc. v. Beam Construction Corp., 41 N.Y. 2d 397, 399-400 (N.Y. App. Div. 1977) ("In determining whether the parties

---

[6]  The agreement embodied by the New Account Form is governed by New York law. Page four of the New Account Form states in part: "JURISDICTION – THIS AGREEMENT AND ITS ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK."  (Sponsorship Program Disclosure, Ex. F to Am. Compl. [Doc. No. 42-6 at 4].)  Minnesota recognizes that "parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made."  Milliken and Co. v. Eagle Packaging, Co., Inc., 295 N.W.2d 377, 380 n.1 (Minn. 1980).

entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds . . . In doing so, disproportionate emphasis is not to be put on any single act, phrase or expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain.").  Upon a complete record, Defendants may renew their argument by way of summary judgment, if appropriate.  The Court therefore denies Defendants' motion with respect to the claim for breach of contract.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Defendants' Motion to Dismiss [Doc. No. 48] is **GRANTED IN PART** and **DENIED IN PART**, consistent with this Order:

1. Defendants' Motion to Dismiss Counts 1, 2, 3, 6, and 8 of the First Amended Class Action Complaint alleging violations of the Minnesota Securities Act is **DENIED**.

2. Defendants' Motion to Dismiss Count 4 of the First Amended Class Action Complaint alleging common law negligence is **GRANTED**.

3. Defendants' Motion to Dismiss Count 5 of the First Amended Class Action Complaint alleging common law negligent misrepresentation is **DENIED**.

4. Defendants' Motion to Dismiss Count 7 of the First Amended Class Acton Complaint alleging common law breach of contract is **DENIED**.

Dated: June 6, 2014                                    s/ Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Court Judge